FILED

05/09/2017

Clerk of the
Appellate Courts



# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### February 7, 2017 Session

## STATE OF TENNESSEE v. JARVIS SHERROD and ANTONIO DODSON

### Appeal from the Criminal Court for Shelby County
#### No. 11-00787        Chris Craft, Judge
_____

### No. W2015-02022-CCA-R3-CD
_____

The Defendants, Jarvis Sherrod and Antonio Dodson, were each convicted by a Shelby County Jury of three counts of especially aggravated kidnapping, two counts of aggravated robbery, one count of aggravated rape, one count of aggravated burglary, and one count of employing a firearm during the commission of a dangerous felony. Sherrod was also convicted of one count of aggravated sexual battery and was sentenced to seventy-three years' incarceration; Antonio Dodson was sentenced to forty-four years' incarceration. In Jarvis Sherrod's appeal, he argues that the trial court erred by: (1) denying his motion to sever his case from that of his co-defendant; (2) denying his right to a speedy trial; (3) improperly admitting a gun into evidence at trial; (4) allowing the victims' prior consistent statements at trial; and (5) improperly exercising its duty as thirteenth juror. In Antonio Dodson's appeal, he argues that the trial court erred by: (1) denying his motion to sever his case from that of his co-defendant; (2) finding that the evidence was sufficient to support two of his especially aggravated kidnapping convictions; (3) allowing improper closing argument by the State; (4) allowing the victims' prior consistent statements at trial; (5) allowing improper expert witness testimony; and (6) denying his motion to dismiss count ten of the indictment for failure to provide sufficient notice of the charge. Upon review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and J. ROSS DYER, JJ., joined.

Charles Edgar Waldman, Memphis, Tennessee, for the Defendant-Appellant, Jarvis Sherrod.

Michael R. Working and Seth M. Segraves, Memphis, Tennessee, for the Defendant-Appellant, Antonio Dodson.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Alexia Fulgham Crump and Eric Christensen, Assistant District Attorney Generals, for the Appellee, State of Tennessee.

## OPINION

On August 8, 2010, and into the early morning hours of August 9, 2010, the Defendants, along with their co-defendant, Lorenzo McKinney, invaded the home of Reno Stafford and Paula Diana and held them captive, along with Stafford's girlfriend, S.C.[1] The Defendants burglarized the home, made multiple trips to the ATM to withdraw money from Stafford's account, and raped and sexually assaulted S.C. On February 5, 2011, the Shelby County Grand Jury returned a twelve-count indictment charging the Defendants with three counts of especially aggravated kidnapping in counts one through three, two counts of aggravated robbery in counts four and five, one count of aggravated rape in count seven, one count of aggravated burglary in count eight, and one count of employing a firearm during the commission of a dangerous felony in count ten. Sherrod was also indicted for a second count of aggravated rape in count six and for unlawful possession of a gun by a convicted felon in count twelve.[2] On February 26, 2013, Dodson filed a motion to sever his case from Sherrod's case, contending that Sherrod had displayed improper behavior in court and might prejudice Dodson's case. The record on appeal does not include a written order disposing of this motion or a transcript of the hearing on the motion. However, following a series of continuances, the Defendants were tried together in April 2015. In their joint trial, both Defendants were convicted as charged with the exception of count seven, in which Sherrod was convicted of the lesser included offense of aggravated sexual battery.

**Trial.** Reno Stafford testified that he and S.C. were at a hotel in Memphis on the evening of August 8, 2010. They left the hotel to get some clothes at Stafford's house on 1795 Capri where he lived with his mother, Paula Diana. Stafford recalled that he and S.C. entered the house, Stafford gave her the clothes, and S.C. went back outside and waited for Stafford in the car. When Stafford walked outside, he was approached by two armed men, who he identified as Sherrod and McKinney. Stafford testified that Sherrod said "'[g]ive me everything,'" and Stafford emptied his pockets of cash, his keys, and a small amount of marijuana. Sherrod and McKinney then forced Stafford and S.C. into the house. Stafford testified that his mother came out of her bedroom and Sherrod and McKinney forced all three victims into the living room. Sherrod forced Diana to lay

---

[1] It is this court's policy to refer to victims of sexual crimes by their initials only.

[2] The Defendants' co-defendant, McKinney, was the only individual charged in counts nine and eleven. McKinney was also named with the Defendants in counts one through five, eight, and ten.

facedown on the couch and Stafford and S.C. to lay down on the living room floor. Stafford testified that they beat him with a broom, hit S.C. in the face, and took his shorts and shoes off while demanding money and drugs. Stafford also testified that Sherrod pulled S.C.'s pants down "and started raping her with his gun." Stafford said that a third man entered the house while Sherrod was raping S.C. He heard the third man say "make sure he keeps his face down," referring to Stafford, and he saw that the man had a towel over his face.

Sherrod and Dodson took S.C. to the back of the house while McKinney stayed in the living room with Stafford and his mother. Stafford testified that they were in the back of the house for about fifteen or twenty minutes while McKinney beat Stafford with a baseball bat, threatened him, and told him "we're going to rape your girlfriend." When the Defendants came back into the living room, Sherrod and McKinney beat Stafford until he gave them his debit card PIN number. Stafford testified that he gave them a fake pin number, hoping they would leave, but that the Defendants took S.C. with them to the ATM and left McKinney at the house. Before the Defendants left, they tied Stafford's hands and feet with clear plastic tape. Stafford testified that the Defendants took his car to the ATM and were gone for fifteen or twenty minutes while McKinney continued to hit Stafford and ask him for drugs and money. When the Defendants and S.C. came back, Stafford "made up some story" that the card did not work because he had already withdrawn the maximum for the day. The Defendants and McKinney decided to wait until midnight so that they could withdraw more money, and Stafford eventually gave them the correct pin number. While they were waiting, Sherrod and McKinney threatened to shoot Stafford and Dodson beat Stafford and called him names. Stafford testified that he then recognized Dodson's voice.

After midnight, the Defendants went back to the ATM and again took S.C. with them, leaving McKinney at the house. After the Defendants came back from the ATM, they dragged Stafford into the bathroom closet and threatened to kill him if he called the police. The Defendants and McKinney then left the house and Stafford broke out of the tape around his hands and feet. S.C. returned in Stafford's car and told Stafford she had been raped. Stafford drove S.C. to the hospital where they met with officers and later gave formal statements. Stafford testified that the Defendants and McKinney were able to withdraw about $400 from his bank account and that they also took about $250 from his pocket as well as some marijuana and Promethazine. Stafford testified that they also took the radio out of his car.

Stafford identified Dodson, Sherrod, and McKinney in photographic lineups the next day. Stafford testified that he knew Dodson from school but that he did not know Sherrod or McKinney. Stafford identified a photograph of Sherrod wearing his shorts, belt, and shoes that were taken from him at his house. Stafford also identified a

photograph of a gun and testified that it was "[t]he gun that [Sherrod] used to rape my girlfriend."

Stafford confirmed that his testimony at the preliminary hearing was consistent with his trial testimony. However, Stafford admitted to giving another statement on April 4, 2011, after the preliminary hearing, in which Stafford told the State's investigator that he "had reason to believe that [S.C.] was involved." Stafford told the investigator that he had seen S.C. in a car with someone who was wearing a red shirt, and that he thought it was one of the shirts taken from his house. Stafford also told the investigator that S.C. received victim's compensation money for the rape and that S.C. "didn't show no [sic] kind of emotion like being offended when they was [sic] raping her with the gun." Stafford told the investigator that he was not sure about his identification of Dodson and that it might instead be someone named Jerald McKinney. At trial, Stafford explained that he had been upset with S.C. when he gave the statement because she had ended their relationship and filed a restraining order against him that day. Stafford also explained that he was only questioning his identification of Dodson based on suggestions from other people. Stafford testified that he no longer believed S.C. was involved.

On cross-examination, Stafford admitted that he smoked marijuana and took Promethazine while at the motel but denied being high when he was at his house. Stafford confirmed that he and S.C. had sex at the motel before driving to his house. Stafford denied that he had seen the Defendants' pictures or names on television before he formally identified them in the lineup, although he recalled seeing the Defendants on the news after his identification. Stafford described the two guns that Sherrod and McKinney had as "a revolver and an automatic." Stafford testified that the revolver was brown or black and that the automatic was black. However, Stafford acknowledged that in his statement to officers he initially identified the revolver as silver. Stafford also acknowledged that the gun in the photograph he had previously identified was not silver and that he could be mistaken about the description of the gun. Stafford agreed that the tape around his hands and feet was easily broken once he tried to free himself.

S.C. testified consistently, in large part, with Stafford's testimony. S.C. said that she left all of her belongings in the motel when they drove to Stafford's house, including her cell phone, ID, and cash. S.C. waited in the car for about ten or fifteen minutes while Stafford was in the house. When Stafford came outside and walked up to the car, S.C. saw "two guys r[u]n up on him." S.C. testified that she had never seen the two men before and that they both had guns and were reaching into Stafford's pockets. S.C. stated that one of the men got in the car, pointed a gun at her, and told her to go inside the house. Once they were inside, Sherrod hit S.C. in the head with his gun and made her lay facedown on the floor, where Sherrod forced her to pull her pants down and raped her vaginally with his gun. Sherrod then ordered S.C. at gunpoint to go to a room in the back

of the house and perform oral sex on him. While S.C. was performing oral sex on Sherrod, Dodson entered the room and said "let me get a piece of that b****." S.C. testified that Dodson's face was covered with a shirt and that he did not have a gun. Sherrod made S.C. wash herself because she was bleeding, and then Dodson vaginally raped her in the bathroom.

After she was raped, S.C. was forced to go with Sherrod to the ATM in Stafford's car. S.C. recalled that Sherrod drove and that Dodson or McKinney may have been with them. S.C. testified that the first PIN number Stafford gave them did not work, so they drove back to the house and McKinney and Sherrod beat Stafford until he gave them the real PIN number. S.C. was then ordered to drive Dodson to the ATM and withdraw the maximum amount, which was about $400. When they arrived back at the house, S.C. was told to sit on a bench in the living room while the Defendants and McKinney "gathered everything up in black bags." After they were done, S.C. testified that they told Stafford his car "would be in the Robin Hood Apartments," but then they changed their mind and ordered S.C. in the car. S.C. was told to put her head down in the backseat, and the Defendants and McKinney got in the car and drove for about ten minutes. S.C. testified that the car stopped and "[t]hey popped the trunk and took [Stafford's] radio system and tossed the keys and told me how to get out and told me to leave." S.C. testified that she drove away "[a]s fast as possible" back to Stafford's house and then Stafford drove her to the hospital. At the hospital, S.C. was referred to the Memphis Sexual Assault Resource Center ("MSARC") where she had an examination and rape kit performed. S.C. acknowledged that she had applied for and received victim's compensation from the State.

S.C. testified that she "instantly" identified Sherrod in a photographic lineup the next day. S.C. also testified that the gun Sherrod used to rape her was a revolver. S.C. identified a photograph of her face taken at the hospital and identified a bruise on her face near her eye. S.C. testified that the bruise was caused by Sherrod hitting her in the face with his gun.

On cross-examination, S.C. was shown the same photograph of the gun that Stafford was shown, and S.C. testified that "[i]t look[ed] to be the gun that [Sherrod] used that night . . . [t]o rape [her]." S.C. denied consuming any drugs or alcohol on the day of the offenses but confirmed that she was "rolling up a blunt" in Stafford's car while she was waiting on him. S.C. denied taking anything from the house or assisting the Defendants or McKinney to take any stolen property out of the house. S.C. confirmed that she was not bound or tied up at any point. S.C. also confirmed that she could not pick Dodson out of a photographic lineup. S.C. stated that she did not learn Sherrod's name until after she identified him in the lineup and that she did not see the Defendants on television. On redirect, S.C. was again asked about the photograph of the gun. S.C.

agreed that it was possible that the gun in the photograph was not the one used to rape her but that "[i]t look[ed] awfully similar."

Paula Diana testified that she lived at 1795 Capri with her son, Stafford. On the night of the offense, Diana was asleep in her bedroom when she heard loud voices and screaming. Diana walked toward the living room when she saw a man, who she identified at trial as McKinney, look around the corner. McKinney told someone to "take care of her," and another man approached Diana, held a gun to her head, and told her to put her head down. Diana testified that the second man, who she identified at trial as Sherrod, frisked her and took her into the living room. Diana saw Sherrod hit S.C. in the head with his gun and say "don't look at me." Diana was ordered to lie facedown on the couch while her ankles and wrists were tied with cords and tape. Diana kept her face down but "peeked up" occasionally and saw Sherrod and McKinney beating Stafford. Diana said both Sherrod and McKinney had guns and were running around the house looking for things. At one point, Diana heard Stafford say "please don't hurt her," but she could not tell what was happening. Diana also heard Sherrod and McKinney talking about a PIN number and going to the bank, and she remembered a third man entering the house. Diana testified that the third man was wearing a shirt on his head to hide his face. When they returned from the bank the second time, Diana heard the perpetrators "ransack[ing] the house." Diana testified that the tape around her hands was "really loose" and that she could have broken out of it but she stayed still "[b]ecause they told [her] to and they had guns."

After the Defendants and McKinney left, Diana was able to free herself and she found Stafford tied up in the bathroom closet. Diana testified that the Defendants and McKinney took electronics, jewelry, wallets, cell phones, clothing, and a purse from her house. Because their phones were stolen, Diana drove to a friend's house to call the police while Stafford and S.C. went to the hospital. Diana estimated that the entire incident lasted about an hour. Diana was not able to identify anyone in photographic lineups the next day. On cross-examination, Diana admitted that she only learned the Defendants and McKinney's identities after she "looked them up and studied them for five years." Diana also admitted that she could not identify the third man because he had his face covered. Diana said that once the attackers left she waited "about five minutes" and then she broke out of the tape around her wrists and ankles in "[o]ne second."

Co-defendant Lorenzo McKinney substantially confirmed the victims' testimony. McKinney acknowledged that he participated in the crimes and that he had a criminal history, including convictions for aggravated robbery and theft. McKinney also confirmed that he expected favorable treatment in exchange for his testimony. McKinney said that he had known Sherrod for about fifteen years and Dodson for a few years. McKinney did not previously know Stafford or S.C.

McKinney testified that, on August 8, 2010, he was with Sherrod at the Hillview Apartments when Dodson came over and told them that someone "just received a large quantity of marijuana." Dodson told them that this person did not have a gun, that they could easily rob him, and that he knew the address. The Defendants and McKinney then got a ride to Stafford's house. McKinney testified that he and Sherrod both had guns; McKinney had an automatic and Sherrod had a "big silver revolver." As they approached the house, McKinney saw Stafford walking out of the front door so he and Sherrod approached him with their guns while Dodson stayed outside. McKinney testified that he pointed a gun at Stafford, demanded marijuana, and Stafford emptied his pockets of a small amount. McKinney and Sherrod forced Stafford and S.C. inside and taped up Stafford and Diana. Stafford denied having any more marijuana, and McKinney took his pants and beat him with a baseball bat and a broom. McKinney saw Sherrod force S.C. to pull her pants down and threaten Stafford that if he did not tell them where the marijuana was he would "stick the gun up [S.C.'s] behind." McKinney also saw Sherrod put the gun near S.C.'s genital area, but he could not tell whether Sherrod penetrated S.C. with the gun. Sherrod then took S.C. to the back of the house. A few minutes later, Dodson came inside with a "shirt or something around his face" and also went to the back of the house. McKinney testified that he called Dodson back to the living room and gave Dodson his gun while he went to the back of the house to search for marijuana.

McKinney testified that they decided to take S.C. to the ATM to withdraw money after finding Stafford's debit card in his wallet. McKinney also testified that he took Stafford's ID card from the wallet and gave it to Sherrod. McKinney said that Stafford initially gave them the wrong PIN number, and McKinney beat him with a baseball bat until he gave them the correct number. McKinney stayed at the house during both trips to the ATM. McKinney testified that he eventually realized that Stafford "was telling the truth" about the marijuana, so they took items from the house and left. McKinney said that they took a TV, a watch, some clothes, about $300 from the ATM, and Stafford's clothes and shoes. McKinney denied that the black revolver in the photograph was the gun used in the crimes. McKinney testified that the guns they used were from "someone at the apartment where [they] hang out," and that they later returned the guns to the owner.

The next day, McKinney was with Sherrod at a house on Brandale when police arrived. McKinney attempted to hide in the attic and Sherrod attempted to hide in a closet, but both were found and arrested. After his arrest, McKinney waived his rights and made a statement to police about the incident. McKinney was unaware of any communication between the Defendants and S.C. before the robbery.

On cross-examination, McKinney testified that S.C. asked for one of Diana's purses while they were going through the house. McKinney also confirmed that S.C. was not tied up and he claimed that no one hit her. McKinney said that officers arrived at the Brandale house to execute an arrest warrant against Sherrod for a domestic violence charge. McKinney initially told police that Sherrod organized and led the home invasion because he was mad at Sherrod for getting them arrested. However, at trial, McKinney testified that the home invasion had actually been Dodson's idea.

Lieutenant David Sloan of the Memphis Police Department ("MPD") received instructions to go to the hospital to interview the victims of a home invasion, rape, and robbery. Lieutenant Sloan testified that when he first met S.C. she was highly upset, crying, and had visible injuries, including a large bruise on her neck. S.C. told Lieutenant Sloan that three people had robbed them and that two of them had raped her both vaginally and orally. S.C. also told Lieutenant Sloan that two of the men were unmasked and that Stafford might know the third masked man. Lieutenant Sloan instructed officers to take S.C. to the rape crisis center for a forensic exam, to take Stafford to Lieutenant Sloan's office to make a formal statement, and to process Stafford's car for fingerprints. After leaving the hospital, Lieutenant Sloan visited the scene at 1795 Capri where he gave instructions to tag evidence and test for DNA and fingerprints.

Lieutenant Sloan interviewed Stafford later at his home and testified that he was "very lethargic, tired, upset," and had multiple injuries to his head and face. Stafford told Lieutenant Sloan that he had been approached by two unmasked men with guns outside his house and that they forced him and S.C. inside where they began beating Stafford and asking him for money, drugs, or anything of value. Stafford also told Lieutenant Sloan that, while he was being beaten, his mother came out of her bedroom and was forced to lie on the couch facedown with her legs and hands taped. Stafford said that the perpetrators threatened him, raped his girlfriend with a gun barrel, and then took her into the bathroom. Stafford also told Lieutenant Sloan that a third person entered the house with a towel or shirt covering his face and that he immediately recognized this person's voice. Stafford told Lieutenant Sloan that he did not know the man's name but that he could recognize him if he saw him.

Lieutenant Sloan testified that Sherrod was developed as a suspect because he was found at the Brandale house with Stafford's ID card in his pocket while wearing blood-stained shoes similar to those taken from Stafford. Dodson was developed as a suspect when the crime lab notified Lieutenant Sloan that they found Dodson's fingerprints on the car. Lieutenant Sloan prepared photographic lineups of the suspects, and Stafford picked out Dodson's photograph immediately. Lieutenant Sloan testified that Stafford and S.C. also picked out Sherrod and McKinney in lineups as the two unmasked men.

S.C. could not positively identify Dodson in the lineup, and Diana could not pick out anyone's photograph since her head was down during the entire incident.

On cross-examination, Lieutenant Sloan maintained that he did not provide Sherrod's name to Stafford before he picked him in the photographic lineup. Lieutenant Sloan also confirmed that there was no video footage from the ATM where the Defendants withdrew money because the bank "had a problem with the camera system at that branch."

MPD Officer William Warren testified that, on August 10, 2010, he drove to 2845 Brandale to execute two arrest warrants for Sherrod. Officer Warren found Sherrod hiding in a closet and arrested him. After conducting a pat down search of Sherrod, Officer Warren found $492 cash and Stafford's ID card in his pocket. Officer Warren testified that officers also found McKinney at the Brandale house hiding in the attic. At trial, Officer Warren identified a photograph of Sherrod wearing the clothes he was arrested in. Officers tagged the clothing collected from Sherrod when he was arrested, including a pair of white tennis shoes, jeans, boxers, a belt, and a shirt. On cross-examination, Officer Warren acknowledged that the warrants for Sherrod were not related to the present case and involved a domestic violence incident.

MPD Sergeant Eric Kelly identified and collected evidence at the Brandale house where Sherrod and McKinney were arrested. In the closet where Sherrod was found, officers found garbage bags full of clothes and a gun. Officers also recovered a TV, a shotgun, multiple phones, and a large amount of marijuana at the house. Sergeant Kelly identified photographs of the gun and identified the actual gun, which was entered into evidence without objection. Sergeant Kelly also processed Stafford's vehicle for fingerprints and identified a palm print that he picked up on the passenger rear door.

Nathan Gathright, an expert in the field of fingerprint examination, testified that he was a latent print examiner for the MPD's crime scene investigation unit. Gathright testified that the print found on Stafford's car belonged to Dodson. Gathright also testified that he did not identify any prints belonging to McKinney or Sherrod.

Judy Pinson testified that she had been a nurse examiner at MSARC for twenty-five years. Pinson testified that her role required her to provide health care to rape victims and collect evidence for trial. Pinson was qualified as an expert in the area of "sexual forensic nurse examiner." Pinson was also a custodian of MSARC's records and identified the MSARC report of S.C.'s examination, which was completed by a MSARC nurse who no longer resided in Tennessee. Pinson read from the report, which stated that S.C. was forced to perform oral sex on two men and was vaginally raped by two men. The report indicated that neither man wore a condom and that a foreign object had been

used. The report further indicated that one of the perpetrators "put the gun barrel in [S.C.'s] butt," but that there had been no anal assault. Pinson agreed that the discrepancy could have been a typing mistake. Pinson further testified that the report indicated S.C. had a petechiae on her cervix, which Pinson described as "little collections of blood underneath the skin." Pinson noted that the petechiae could have been caused by a gun or by penile penetration, but agreed that it was more likely the petechiae was caused by a gun. The report further indicated that S.C. had vaginal sex within four days of the assault, and the exam took place seven hours after the assault. Pinson testified that the report also noted that S.C. had "left [p]eriorbital purple bruising," or "a black eye," and that S.C. was "trembling and sobbing." On cross-examination, Pinson confirmed she had no personal knowledge of S.C.'s injuries.

Jessica Marquez, an expert in DNA forensic analysis, testified that she was employed by the Tennessee Bureau of Investigation and assigned to the forensic biology section where she performed serology and DNA testing. Marquez testified that she was given samples from S.C., Stafford, the Defendants, and McKinney. Marquez testified that swabs from the gun found at the Brandale house indicated a DNA profile from an unidentified male. Marquez testified that the blood found on Sherrod's shoes tested positive for Stafford and S.C.'s DNA. Marquez also testified that a vaginal swab from S.C.'s rape kit tested positive for Dodson's DNA. On cross-examination, Marquez confirmed that none of the DNA samples tested positive for Sherrod's DNA. Marquez also confirmed that the DNA tests could not indicate whether sexual activity was consensual.

Sherrod testified on his own behalf. He stated that, on the morning of August 10, 2010, he arrived at the Brandale house to meet with McKinney. Sherrod said that McKinney and Antonio Dodson, Sr., Dodson's father, lived at the house with another man. Sherrod said he took a shower and then put on McKinney's clothes and shoes, which he found in a "black bag" in the closet. Sherrod testified that he was aware of an outstanding warrant for his arrest on domestic violence charges, and that he planned to turn himself in that day. Sherrod said McKinney gave him an ID card and told him to give it "to a female" they knew, and Sherrod put it in his pocket. When the police showed up, Sherrod hid in a closet while McKinney hid in the attic. Sherrod hid because he "wanted to turn [him]self in" rather than be arrested. Sherrod claimed that he did not know anything about the home invasion at 1795 Capri or where the ID card came from. Sherrod also testified that he had never seen the gun in the photograph identified by Stafford and S.C. Sherrod said that he had seen S.C. with Dodson multiple times in the past at the Brandale house. Sherrod claimed that the money found in his pocket came from gambling and that, on the night of the crimes, he was at a strip club with his father, brother, and cousins.

- 10 -

On cross-examination, Sherrod confirmed his belief that the officers were attempting to frame him for the offenses in this case. Sherrod denied raping S.C. and contended that officers coerced her to pick him in the photographic lineup. Sherrod testified that S.C. was not a victim and that she "want[ed] to exclude herself from being prosecuted." Sherrod said that the victims' identification of him and the fact he was wearing Stafford's clothes and shoes and had Stafford's ID card in his pocket were all coincidences. He also testified that he believed the shoes he was wearing at the time of his arrest had been "tampered with" by Lieutenant Sloan to test positive for Stafford and S.C.'s DNA. Sherrod testified that he did not really know Dodson but that he had seen him a couple of times.

Dodson presented testimony from Jennifer Hoff, his investigator, who testified that she interviewed Stafford and Diana at their home on April 30, 2012. Hoff confirmed that Diana told her "something was fishy about that night" and that Diana and S.C. did not get along. She also confirmed that Diana stated Stafford had been cheating on S.C., that S.C. "might be trying to get back at them," and that she believed S.C. set them up. On cross-examination, Hoff confirmed that her testimony was based on a summary of notes from her interview with Diana and that Diana never reviewed or signed off on the notes and that the interview had not been recorded.

At the conclusion of the proof, the Defendants were found guilty of three counts of especially aggravated kidnapping in counts one through three, two counts of aggravated robbery in counts four and five, one count of aggravated burglary in count eight, and one count of employing a firearm during the commission of a dangerous felony in count ten. Sherrod was found guilty of aggravated rape in count six and Dodson was also found guilty of aggravated rape in count seven. Sherrod was found guilty of the lesser included offense of aggravated sexual battery in count seven. Additionally, count twelve, charging Sherrod with unlawful possession of a handgun as a convicted felon, was dismissed.[3] The trial court sentenced Dodson to an effective sentence of forty-four years and Sherrod to an effective sentence of seventy-three years. The Defendants both filed motions for new trial, which were denied after an evidentiary hearing on October 8, 2015. This timely appeal followed.

## ANALYSIS

On appeal, both Defendants challenge (1) the trial court's denial of their motions to sever their cases and (2) the admission of the victims' prior consistent statements at trial through the testimony of Lieutenant Sloan. Additionally, Sherrod argues that the

---

[3] There are two different judgment forms indicating the dismissal of count twelve, one entered in April 2015 and one in August 2015.

- 11 -

trial court erred by (3) denying his right to a speedy trial; (4) improperly admitting a gun into evidence at trial; and (5) improperly exercising its duty as thirteenth juror. Dodson argues that the trial court also erred by (6) finding that the evidence was sufficient to support two of his especially aggravated kidnapping convictions; (7) allowing improper closing argument by the State; (8) allowing improper expert witness testimony; and (9) denying his motion to dismiss count ten of the indictment for failure to provide sufficient notice of the charge.

  **I.**  **<u>Severance.</u>**   First, both Defendants argue on appeal that the trial court improperly denied their motions to be tried separately. Dodson contends that he was prejudiced by Sherrod's behavior at the sentencing hearing, by Sherrod's refusal to accept a settlement contingent on both Defendants' acceptance, and by Sherrod's additional charge of aggravated rape and introduction of the gun allegedly used in that rape, which Dodson argues "was not relevant to his case and was so prejudicial that the cases should have been severed for a fair determination of guilt or innocence." Sherrod argues that the entry of the gun also prejudiced his case, along with the DNA evidence against Dodson and "the differences in the indictments against the two defendants." The State argues that the severance issue is waived because the Defendants failed to provide a complete and accurate record on appeal and because Sherrod failed to file a pretrial motion for severance. The State contends that, waiver notwithstanding, the Defendants are not entitled to relief.

  Tennessee Rule of Criminal Procedure 14(c)(2) provides that a defendant is entitled to a severance if it is appropriate or necessary to promote or achieve a fair determination of that defendant's guilt or lack thereof. However, the decision to grant or deny a motion for severance of defendants rests within the sound discretion of the trial court, and this court will not disturb the trial court's ruling absent clear abuse of that discretion. <u>State v. Dotson</u>, 254 S.W.3d 378, 390 (Tenn. 2008). "Where a motion for severance has been denied, the test to be applied in determining whether the trial court abused its discretion is whether the defendant was 'clearly prejudiced' in his defense as a result of being tried with his co[-]defendant[.]" <u>State v. Price</u>, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000). The defendant must show that he or she "was clearly prejudiced to the point that the trial court's discretion ended and the granting of severance became a judicial duty." <u>Parham v. State</u>, 885 S.W.2d 375, 383 (Tenn. Crim. App. 1994).

  Dodson filed a pretrial motion for severance on February 26, 2013. However, the record provided on appeal does not include a written order disposing of his motion or a transcript of the hearing on the motion. In fact, it is noted in a pretrial hearing transcript by the court reporter that "a motion for severance was heard as to Dodson, Tuesday, February 26th, using Jarvis Sherrod as causing a possible outburst, impacting Dodson, but not requested to be made a part of this transcript." Sherrod concedes that he did not

file a motion for severance but claims that he joined with Dodson for an "oral request for severance" on the first day of trial. However, the record reflects the trial court did not respond to the Defendants' brief mention of severance, and no further discussion or objection followed. Although both Defendants raised severance issues in their written motions for new trial, at the hearing on the motions the trial court simply remarked that there was "no legal requirement for severance."

We conclude that both Defendants have waived this issue by failing to provide an adequate record on appeal. The appellant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). "Where . . . the record is incomplete, and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which a party relies, this Court is precluded from considering the issue." State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988) (citing State v. Groseclose, 615 S.W.2d 142, 147 (Tenn. 1981); State v. Jones, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981)). "In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence." State v. Bibbs, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citing Smith v. State, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979); Vermilye v. State, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)). The Defendants have not provided a transcript of the hearing on Dodson's motion for severance or any documentation of the motion's disposition. Additionally, Sherrod has further waived this issue by failing to make a pretrial motion for severance. See Tenn. R. Crim. P. 14(1)(A) (providing that a motion for severance "shall be made before trial" and that "[a] defendant waives severance if the motion is not timely."); see also Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). With the present state of the record, we are constrained to presume that the trial court's effective denial of the Defendants' request for severance was correct. See Bibbs, 806 S.W.2d at 790.

Waiver notwithstanding, the Defendants are still not entitled to relief. Dodson first argues that he was entitled to severance because he wanted to settle, Sherrod wanted to proceed to trial, and the State's offer was contingent on both Defendants pleading guilty. As the State correctly notes, "[w]hen the state has made an offer of settlement contingent upon all of the defendants accepting the offer and pleading guilty, a defendant who wants to accept the offer and plead guilty is not entitled to a severance from a defendant who has rejected the settlement and opted for trial." Parham, 885 S.W.2d at 383-84. Dodson also has not proven any prejudice by Sherrod's behavior at trial, particularly considering that the only behavior he cites occurred at the sentencing hearing after he had already been convicted.

- 13 -

Dodson's reliance on this court's holding in State v. Christopher Swift is also misplaced. No. W2013-00842-CCA-R3-CD, 2015 WL 2128782, at *9 (Tenn. Crim. App. May 5, 2015). In Christopher Swift, this court held that the trial court improperly denied a severance based primarily on the disparity of the convicting evidence against each co-defendant. Id. at *10. This court also held that the trial court improperly allowed presentation of a gun as demonstrative evidence at trial, which was relevant to only one defendant's case. Id. at *15. We found that the presentation of the gun was not harmless, particularly in light of the fact that the defendants' cases should have been severed. Id. However, unlike Christopher Swift, the gun in this case was introduced as an exhibit at trial and entered into evidence without objection, not used as demonstrative evidence. Further, the instant gun was found with Sherrod at the time of his arrest, unlike the gun in Christopher Swift which was completely unrelated to the case. In any event, the primary holding in Christopher Swift concerned the disparity in the convicting evidence against the two defendants. In this case, Dodson's DNA was found on the car used to drive S.C. to the ATM and on S.C.'s vaginal swab. Dodson's co-defendant, McKinney, and a victim, Stafford, also identified him as one of the perpetrators. Accordingly, Christopher Swift does not apply here and Dodson has not shown prejudice.

The Defendants' claims that they were both prejudiced by Sherrod's additional rape charge and introduction at trial of the gun he allegedly used in that rape are likewise without merit. The offenses on trial were so closely connected, involving an extensive and continuous crime spree inflicted upon the three victims, that it was appropriate to try the Defendants together. See Tenn. R. Crim. P. 8(c). S.C. testified that she was raped by both Defendants multiple times, that the assaults occurred in close temporal proximity, that Sherrod used a gun during one of the assaults, and that the photograph she was shown at trial looked similar to the gun Sherrod used. Furthermore, "[t]he mere fact that damaging proof against one defendant is presented will not, by itself, entitle another defendant to a severance." State v. Meeks, 867 S.W.2d 375 (Tenn. Crim. App. 1993).

Lastly, although Sherrod claims that he was prejudiced by the DNA evidence against Dodson, the DNA evidence did not alone implicate Dodson. Rather, Dodson, as well as Sherrod, was implicated by an overwhelming accumulation of physical and circumstantial evidence. Further, the jury clearly considered each Defendant separately because Sherrod was found guilty of the lesser included offense of aggravated sexual battery in count seven, which charged him and Dodson with aggravated rape. Sherrod also has not cited to any evidence introduced against him that would have been inadmissible in a separate trial. Even considering the merits of the Defendants' claims, they are not entitled to relief.

**II. Prior Consistent Statements.** The Defendants next argue that the trial court improperly allowed Lieutenant Sloan to testify about Stafford and S.C.'s statements. The Defendants contend that neither victim had been impeached as to credibility concerning those particular statements and that the trial court failed to instruct the jury not to consider the statement for the truth of the matter asserted. The State responds that the victims' credibility was attacked on cross-examination and that the statements were properly admitted. The State further responds that the Defendants have waived the jury instruction issue.

In determining whether a statement is hearsay and, if so, whether it fits within one of the exceptions to hearsay, a trial court may make factual findings and credibility determinations in ruling on an evidentiary motion, and "these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them." Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015) (citing State v. Gilley, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). However, "[o]nce the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule— are questions of law subject to de novo review." Kendrick, 454 S.W.3d at 479 (citing State v. Schiefelbein, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); Keisling v. Keisling, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)).

"[U]nder general evidentiary rules, prior consistent statements may be admissible, as an exception to the rule against hearsay, to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied." State v. Benton, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988). However, before a prior consistent statement becomes admissible, "the witness'[s] testimony must have been assailed or seriously questioned to the extent that the witness'[s] credibility needs shoring up." Id. at 433-34. "The impeaching attack on the witness's credibility need not be successful for admissibility of the prior consistent statement." State v. Albert R. Neese, No. M2005-00752-CCA-R3-CD, 2006 WL 3831387, at *6 (Tenn. Crim. App. Dec. 15, 2006). "A prior consistent statement used to rehabilitate a witness is not hearsay as it is not offered for the truth of the matter asserted." Id. (citing Tenn. R. Evid. 801(c)).

Lieutenant Sloan interviewed S.C. at the hospital immediately after the offenses and testified about S.C.'s statement that three men robbed her and her boyfriend and that two of the men raped her. Lieutenant Sloan also testified regarding his interview with Stafford, in which Stafford recalled being approached by two armed men outside his house, being beaten, seeing his girlfriend raped by Sherrod in the living room, and that Stafford recognized the third man's voice. While Lieutenant Sloan was testifying about Stafford's statement, the Defendants objected to hearsay and argued that "none of that has been disputed as inconsistent" and that "[n]o one challenged [S.C.] or Mr. Stafford on

- 15 -

any of those facts" so the victims' testimony was being inappropriately bolstered. The trial court ruled that it was not hearsay because it was being offered "to show the credibility of Mr. Stafford" and not for the truth of the matter asserted. The trial court further noted that Stafford had identified both of the Defendants, which put his credibility at issue and allowed the State "to show prior consistent statements by him."

Stafford and S.C. were both vigorously cross-examined regarding contradictions in their trial testimony and their statements to police and investigators. Each cross-examination directly challenged the victims' ability to identify the Defendants and the victims' credibility. Counsel repeatedly inferred that Stafford and S.C.'s identifications of the Defendants were tainted by police officer suggestions and media coverage, that S.C. was not a victim, and that S.C. was an accomplice in the crimes. Counsel also questioned both victims' recollection of the events by repeatedly asking about their drug use on the day of the offenses. As a result, the victims' statements to Lieutenant Sloan were admissible as prior consistent statements to rehabilitate their credibility. Furthermore, Lieutenant Sloan's testimony did not exceed the scope of rehabilitation warranted by the cross-examinations. Stafford and S.C.'s statements to Lieutenant Sloan did not include any additional details not found in their own testimony, and McKinney's testimony also provided corroboration of the statements. The trial court did not abuse its discretion by admitting Lieutenant Sloan's testimony. Finally, a review of the record reveals that the Defendants did not request a limiting instruction. Because an instruction was not requested, the issue is waived. See Tenn. R. App. P. 36(a); Tenn. R. Evid. 105; see also State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000) ("A trial court, however, generally has no duty to exclude evidence or to provide a limiting instruction to the jury in the absence of a timely objection."); State v. Robinson, 971 S.W.2d 30, 43 (Tenn. Crim. App. 1997). The Defendants are not entitled to relief.

**III. Speedy Trial.** Next, Sherrod argues that his right to a speedy trial was violated. He asserts that the trial delay "contributed to material[] and irreversible[] changes in circumstance in both his mental health and his defense." The State responds that Sherrod has failed to establish a speedy trial violation and that the trial court properly denied relief.

Sherrod was arrested on August 10, 2010, and indicted by a Shelby County Grand Jury on February 5, 2011. The first trial date mentioned in the record is March 4, 2013. On February 25, 2013, Dodson filed a motion for continuance requesting more time to obtain additional DNA evidence because settlement negotiations with the State had failed. On February 28, 2013, Sherrod filed a notice of alibi defense. At a March 1, 2013 hearing, Dodson's counsel informed the trial court that "[b]oth parties have documents that we are trying to get a hold of before this is tried." Sherrod's counsel also informed the court that he "will certainly go on the record and say that we have no objection to a

continuance." The parties agreed to a report date of April 3, 2013, but not a new trial date. The record does not reflect anything else occurring for approximately nineteen months until Sherrod's counsel requested another continuance on November 6, 2014, to complete Sherrod's competency evaluation. All parties agreed that the new trial date would be contingent on the completion of Sherrod's competency evaluation. At the hearing it was noted that trial was currently set for February 23, 2015. Sherrod never filed a motion for a speedy trial, and the parties proceeded to trial on April 6, 2015. Sherrod was convicted on April 13, 2015.

At the motion for new trial hearing, Sherrod informed the trial court, for the first time, that one of his alibi witnesses, Warner Gaters, had passed away on January 12, 2014, and that the loss of this witness prejudiced his defense. Sherrod also argued that his incarceration had caused him to suffer mental health problems. The trial court found that Sherrod never requested a speedy trial and that, if he had, the court "would have tried it two weeks later." As to the notice of alibi, the court said that Sherrod likewise never brought this issue to the court's attention and that the trial court "d[i]dn't know who Mr. Gaters [wa]s." The trial court also noted that Sherrod had never raised any issue regarding his mental or physical status.

Both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution guarantee an accused the right to a speedy trial. See U.S. Const. amend VI; Tenn. Const. art. 1, § 9. The right to a speedy trial is also statutorily protected in Tennessee. See T.C.A. § 40-14-101 ("In all criminal prosecutions, the accused is entitled to a speedy trial and to be heard in person and by counsel."). In addition, Rule 48(b) of the Tennessee Rules of Criminal Procedure provides that the court may dismiss the indictment if there is unnecessary delay in bringing a defendant to trial. Tenn. R. Crim. P. 48(b). "The purpose of the speedy trial guarantee is to protect the accused against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished." State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997) (citing Doggett v. United States, 505 U.S. 647, 654 (1992)).

The constitutional right to a speedy trial is not implicated until there is an arrest or a formal accusation from a grand jury. State v. Simmons, 54 S.W.3d 755, 758-59 (Tenn. 2001) (citing Utley, 956 S.W.2d at 491). When evaluating claims of a speedy trial violation, we apply the four-part balancing test set forth in Barker v. Wingo, 407 U.S. 514 (1972). See also State v. Bishop, 493 S.W.2d 81, 83-85 (Tenn. 1977) (adopting the Barker analysis in Tennessee). The Barker factors are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) the prejudice to the defendant because of the delay. Barker, 407 U.S. at 530; Simmons, 54 S.W.3d at 759. "The factors relevant to a speedy trial inquiry are interrelated and depend

upon the particular circumstances of each case." Simmons, 54 S.W.3d at 762 (declining to articulate a bright-line rule for speedy trial claims); see also Barker, 407 U.S. at 530 ("A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis."). If a reviewing court concludes that the accused has been denied the right to a speedy trial, the only remedy is reversal of the conviction and dismissal of the indictment. See Barker, 407 U.S. at 522; Bishop, 493 S.W.2d at 83. We review a trial court's determination of whether a defendant's right to a speedy trial was violated under an abuse of discretion standard. State v. Hudgins, 188 S.W.3d 663, 667 (Tenn. Crim. App. 2005) (citing State v. Jefferson, 938 S.W.2d 1, 14 (Tenn. Crim. App. 1996)); State v. Easterly, 77 S.W.3d 226, 236 (Tenn. Crim. App. 2001); State v. Gai D. Kuot, No. M2012-01884-CCA-R3-CD, 2013 WL 4539020, at *10 (Tenn. Crim. App. Aug. 26, 2013).

A. Length of Delay. We first consider the length of the delay. The Tennessee Supreme Court has held that "either a formal indictment or information or else the actual restraint imposed by arrest and holding to answer a criminal charge" triggers the speedy trial analysis. Utley, 956 S.W.2d at 492 (quoting State v. Wood, 924 S.W.2d 342, 345 (Tenn. 1996)); see also State v. Baker, 614 S.W.2d 352, 354 (Tenn. 1981) (holding that "no speedy trial rights arise until after formal accusation, either by arrest or by grand jury action."). A post-accusation delay of one year or more is "presumptively prejudicial" and will trigger a speedy trial inquiry. Utley, 956 S.W.2d at 494. "The reasonableness of the length of the delay depends on the complexity of the case." Wood, 924 S.W.2d at 346. "[D]elay that can be tolerated for 'an ordinary street crime' is generally much less than for a serious, complex felony charge." Easterly, 77 S.W.3d at 235 (quoting Barker, 407 U.S. at 530-31). However, the presumption that the delay has prejudiced the defendant intensifies over time. Simmons, 54 S.W.3d at 759 (citing Doggett, 505 U.S. at 652; Utley, 956 S.W.2d at 494; Wood, 924 S.W.2d at 346).

Here, Sherrod was arrested on August 10, 2010, and indicted on February 5, 2011. Trial began on April 6, 2015, four years and eight months after Sherrod was first arrested. While this delay triggers a speedy trial inquiry, the delay is not per se unreasonable when compared to other cases. See Wood, 924 S.W.2d at 346 (delay of thirteen years did not violate right to speedy trial); see also Barker, 407 U.S. at 533-36 (five-year delay between arrest and trial did not violate right to speedy trial). This case involved a twelve-count indictment for twenty-seven felony charges against three defendants. It also involved numerous pre-trial motions, hearings, and continuances requested by the State and the Defendants. In our view, the length of the delay, while extensive, does not weigh heavily against the State.

B. Reason for Delay. The next factor to consider is the reason for the delay. The reasons for post-accusation delay generally fall within four categories: (1) intentional delay to gain a tactical advantage over the defense or to harass the defendant; (2)

bureaucratic indifference or negligence, including lack of due diligence; (3) delay necessary for the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense. Wood, 924 S.W.2d at 346-47; see also Simmons, 54 S.W.3d at 759. Deliberate delay is weighed heavily against the State. Negligent delay is also weighed against the State, but less heavily than intentional delay. Delay necessary for effective prosecution, such as locating a missing witness, is considered valid and not weighed against either party. A delay caused or agreed to by the defendant is weighed against the defendant. Wood, 924 S.W.2d at 346-47; see also Barker, 407 U.S. at 531.

The first trial delay was requested by Dodson to obtain more DNA evidence because settlement negotiations with the State had failed. Sherrod's counsel acquiesced to the request. The second continuance was requested by Sherrod to complete a competency evaluation. There is no information provided about this evaluation in the record or how long it took to complete. However, based on his acquiescence to the first trial delay and his request of the second delay, we find that this factor weighs against Sherrod.

C. Assertion of Right. The third factor to evaluate is whether the accused asserted the right to a speedy trial. Assertion of the right weighs strongly in favor of the defendant, while failure to assert the right will make it difficult to prove that the right has been denied. Simmons, 54 S.W.3d at 760 (citing Barker, 407 U.S. at 531-32). The record reflects, Sherrod concedes, and the trial court emphasized, that Sherrod never asserted his right to a speedy trial. This factor also weighs against Sherrod.

D. Prejudice from Delay. The final factor, the prejudice to the accused caused by the delay, is the most important to consider in the speedy trial inquiry. Simmons, 54 S.W.3d at 760 (citing Barker, 407 U.S. at 532; Wood, 924 S.W.2d at 348; Bishop, 493 S.W.2d at 85). The prejudice factor is assessed in light of the interests that the right to speedy trial is designed to protect. Barker, 407 U.S. at 532 (identifying three interests of the accused: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired."); see also Simmons, 54 S.W.3d at 760 (citing Bishop, 493 S.W.2d at 85). The Tennessee Supreme Court has observed that "the most important issue concerning prejudice to the defendant is the impairment of the ability to prepare a defense." Berry, 141 S.W.3d at 568 (citing Baker, 614 S.W.2d at 356); see also Barker, 407 U.S. at 532 ("Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."). "Faded memories, erosion or loss of potentially exculpatory evidence, and loss of potentially favorable witnesses are all possible results of a lengthy delay." Wood, 924 S.W.2d at 346.

Courts have recognized the difficulty in establishing impairment to the defense and have held that "affirmative proof of particularized prejudice is not essential to every speedy trial claim." See Doggett, 505 U.S. at 654-55 (finding delay of eight-and-a-half years between indictment and arrest caused by government's negligence to be "excessive" and a violation of defendant's speedy trial rights though defendant could not demonstrate specific prejudice). Nevertheless, in the majority of cases, "courts will still look for a demonstration of actual prejudice." Easterly, 77 S.W.3d at 238; Wood, 924 S.W.2d at 348; State v. Roger David Browder, No. 02C01-9606-GS-00201, 1998 WL 47877 (Tenn. Crim. App. Feb. 9, 1998) ("[E]ven though affirmative proof of particularized prejudice is not essential to every speedy trial claim . . . we find it difficult to evaluate the degree to which the delay prejudiced the defendant absent some specific information about the deprivations which he incurred.").

Here, Sherrod argues that the nearly five-year delay in his case prejudiced him by impairing his defense and causing mental anguish. Specifically, he asserts that "his level of personal anxiety continued to increase during the ongoing pendency of the case" and that his mental condition further deteriorated as a result of the death of his alibi witness, Gaters. However, Sherrod never mentioned Gaters or any alibi witness at any hearings or motions included in the record, and the trial court noted that it "d[i]dn't know who Mr. Gaters [wa]s" and that the issue had "never been brought before [the trial court] at all." On appeal, Sherrod also relies on facts outside the record regarding his medical diagnoses, prescriptions, and mental health evaluations. The trial court found at the motion for new trial hearing that none of Sherrod's claims about his mental health were ever raised before or during trial. Further, considering Sherrod's extensive criminal history and experience with the criminal justice system, and his four additional sets of charges that were pending while he was incarcerated for the instant case, we cannot conclude that any anxiety suffered was so great as to outweigh the other factors in the analysis.

After applying the Barker balancing test, we conclude that the Defendant's right to a speedy trial was not violated. As we have previously noted, the factors are interrelated and depend on the particular circumstances of the case. We cannot ignore that Sherrod never asserted his right to a speedy trial, acquiesced in delaying trial at least once, and requested another delay. Sherrod has also failed to establish any prejudice to his defense as a result of the delay. Accordingly, the Defendant has failed to establish a speedy trial violation.

**IV. Admission of Gun.** Next, Sherrod argues that the trial court improperly admitted a gun into evidence at trial. He contends that the gun was irrelevant and unfairly prejudicial. The State responds that the gun was relevant because it was

- 20 -

recovered from the home where McKinney and Sherrod were staying and because the victim initially believed it to be the weapon used in her rape.

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W.3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)).

To be admissible, all evidence must be relevant to an issue the jury must decide. State v. Thomas, 158 S.W.3d 361, 394 (Tenn. 2005) (citations omitted); State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978).

As an initial matter, Sherrod did not object at trial to the introduction of either the photograph of the gun or the gun itself. Accordingly, he risks waiver of the issue. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); see also Tenn. R. Evid. 103(a)(1) (requiring a timely objection as a prerequisite to a finding of error based on the trial court's admission of evidence). Potential waiver notwithstanding, Sherrod is not entitled to relief.

At trial, S.C. was presented with a photograph of the gun which she identified as the gun used to rape her; she later admitted that the gun may not have been the actual gun used to rape her but that "[i]t look[ed] awfully similar." Stafford also identified the gun as that used to rape S.C., but acknowledged on cross-examination that he may have been mistaken about the identification. Lieutenant Sloan testified that the gun was found in the closet where Sherrod was hiding when he was arrested, along with other relevant evidence. During closing argument, the State conceded that the gun was probably not the gun actually used to rape S.C. Sherrod and McKinney both denied that the gun in the

photograph was the gun used in the offenses. At the motion for new trial hearing, the trial court found that admission of the gun was relevant because the gun was found with Sherrod when he was arrested. The court also noted that defense counsel never raised this issue at trial and that "it's up to the jury to decide what use they're to make of that exhibit." Based on the record, we cannot conclude that the trial court abused its discretion. The gun was relevant because it was found with Sherrod when he was arrested and the victim initially identified the gun as the gun used to rape her. Furthermore, the assault performed with the gun was far more inflammatory than the gun itself and any prejudice resulting therefrom. The jury was allowed to weigh the evidence accordingly. Sherrod is not entitled to relief.

**V. Thirteenth Juror.** Sherrod also claims that the trial court improperly exercised its duty as the thirteenth juror by "repeatedly remarking on the lack of a motion, or an objection, as the foundation for its silence on an issue." The State responds that the trial court fulfilled its duty to act as the thirteenth juror.

Tennessee Rule of Criminal Procedure 33(d) provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This court has held that Rule 33(d) "is the modern equivalent to the 'thirteenth juror rule,' whereby the trial court must weigh the evidence and grant a new trial if the evidence preponderates against the weight of the verdict." State v. Blanton, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). When acting as the thirteenth juror, the trial judge is not required to make an explicit statement on the record. State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995). Instead, the reviewing court may presume that the trial judge has fulfilled its duty as the thirteenth juror when it overrules a motion for new trial. Id. Only if the record contains statements by the trial court expressing dissatisfaction or disagreement with the weight of the evidence or the jury's verdict or indicating that the trial court absolved itself of its responsibility to act as the thirteenth juror may an appellate court reverse the trial court's judgment. Id. (citations omitted). Otherwise, appellate review is limited to sufficiency of the evidence pursuant to Tennessee Rule of Appellate Procedure 13(e). State v. Burlison, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). If the reviewing court concludes that the trial court failed to fulfill its duty as the thirteenth juror, the appropriate remedy is to grant a new trial. State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995).

First, we note that the trial transcript ends before the jury returned its verdict and, therefore, does not include any statement by the trial court about acting as thirteenth juror. However, the transcript from the motion for new trial hearing shows that the trial court recalled sufficient details from this case and fulfilled his duty as the thirteenth juror by denying both Defendants' motions for new trial and expressing his agreement with the jury's verdict. See Carter, 896 S.W.2d at 122. Further, the fact that Sherrod waived

certain issues by failing to object at trial or file appropriate motions does not relate to the trial court's duty as thirteenth juror. The trial court properly fulfilled its role as the thirteenth juror, and, therefore, this issue is not subject to appellate review.

**VI. <u>Sufficiency of the Evidence.</u>** Next, Dodson argues that the trial court erred by finding that the evidence was sufficient to support his convictions for the especially aggravated kidnappings of Stafford and Diana. Specifically, Dodson, citing <u>State v. White</u>, 362 S.W.3d 559 (Tenn. 2012), argues that the evidence is insufficient to sustain his convictions for especially aggravated kidnapping because the State failed to prove that the confinement of the victims was to a greater degree than necessary to commit the offense of aggravated robbery. The State responds that the evidence showed both victims were restrained by threats of violence for far longer than required to complete the robberies.

When an appellate court reviews the sufficiency of the evidence, it must consider whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. <u>State v. Hall</u>, 8 S.W.3d 593, 599 (Tenn. 1999). If the evidence is insufficient to support a finding of guilt beyond a reasonable doubt, the conviction must be set aside. Tenn. R. App. 13(e). On review, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn from it. <u>State v. Goodwin</u>, 143 S.W.3d 771, 775 (Tenn. 2004). The appellate court may not re-weigh the evidence or substitute its inferences for those drawn by the trier of fact. <u>Smith</u>, 24 S.W.3d at 279. The trier of fact resolves questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence. <u>State v. Reid</u>, 91 S.W.3d 247, 277 (Tenn. 2002). Accordingly, "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997). Further, a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant bears the burden of demonstrating that the evidence is insufficient to support the verdict. <u>State v. Carruthers</u>, 35 S.W.3d 516, 557-58 (Tenn. 2000).

To sustain the conviction for especially aggravated kidnapping, the State had to prove beyond a reasonable doubt that Dodson knowingly removed or confined the victim so as to interfere substantially with the victim's liberty and that the removal or confinement was accomplished with a deadly weapon. <u>See</u> T.C.A. §§ 35-13-302(a)(1), -305(a)(1). In <u>State v. White</u>, the Tennessee Supreme Court concluded that the Tennessee kidnapping statutes were not meant to apply to a removal or confinement of a victim that was "essentially incidental" to the accompanying felony and that this inquiry was a factual question for a properly instructed jury to resolve. 362 S.W.3d at 576-78. This is

because the "essentially incidental" language in State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), which previously informed appellate due process review, was now a part of a material element of kidnapping. White, 362 S.W.3d at 578 ("[W]e are merely providing definition for the element of the offense requiring that the removal or confinement constitute a substantial interference with the victim's liberty."). Accordingly, to protect the defendant's due process rights, trial courts must instruct juries to determine "whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction." Id. at 578.

We conclude that the evidence is sufficient to sustain the jury's verdict. Viewed in the light most favorable to the State, the evidence established that Dodson, along with Sherrod and McKinney, held Stafford and Diana at gunpoint and took property from their house, from Stafford's person, and from Stafford's bank account at an ATM. Stafford was beaten and threatened and Stafford and Diana were both bound at the wrists and ankles with cords and tape. Diana was forced to lie facedown on the couch during the entire episode, and Stafford was forced to lie on the living room floor until they bound him and shoved him in the bathroom closet. From this evidence, the jury could have easily concluded that the confinement of Stafford and Diana prevented them from summoning help and greatly increased the threat of harm. Although Dodson argues that they were only loosely bound and could have freed themselves if they wanted to, the victims testified that they complied with the Defendants' demands because the Defendants threatened to harm Stafford and Diana. Even if the victims were not physically bound at all, they were held captive by the Defendants' demands and threats of violence. The victims' testimony, which was accredited by the jury, more than adequately establishes that Dodson unlawfully confined the victims and that this confinement was not merely incidental to the robberies. Therefore, the evidence is sufficient to sustain Dodson's convictions for two counts of especially aggravated kidnapping.

**VII. Closing Arguments.** Next, Dodson argues that the State made inappropriate comments during its rebuttal closing argument, including commenting on witness credibility, addressing issues broader than the guilt or innocence of the Defendants, commenting on Dodson's right not to testify, repeatedly insulting the defense theory, and making improper appeals for sympathy. The State responds that the issues are waived because Dodson did not properly object at trial and that, regardless, the comments were not improper and did not prejudice the jury's verdict.

The Tennessee Supreme Court has noted that "[c]losing argument is a valuable privilege that should not be unduly restricted." State v. Stephenson, 195 S.W.3d 574, 603 (Tenn. 2006) (citing State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001)). The trial court has substantial discretion in controlling the course of arguments and will not be reversed

- 24 -

unless there is an abuse of that discretion.  Id.  In addition, prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant.  Id. (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)).  However, an attorney's comments during closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'"  State v. Gann, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007) (quoting State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)).  In order to be entitled to relief on appeal, the defendant must "show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment."  State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996).

This court must consider the following factors when determining whether the argument of the prosecutor was so inflammatory or improper to negatively affect the verdict: (1) the conduct complained of under the facts and circumstances of the case; (2) any curative measures undertaken by the court or prosecutor; (3) the intent of the prosecutor in making the challenged statements; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.  State v. Goltz, 111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003) (citing Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

As an initial matter, Dodson made no objection at trial to any of the specific comments he now complains of on appeal.  Although Dodson makes numerous complaints about the State's rebuttal closing argument, he did not object until after the State's rebuttal closing argument and on entirely different grounds.  Dodson's counsel objected that "there was a comment at the end that Mr. Dodson raped her twice.  Based on the election of offenses I would ask for a curative instruction as to that."  The trial court overruled his objection and Dodson raised no further objections.  Dodson's failure to make contemporaneous objections at the time the comments occurred resulted in waiver of these issues.  See Tenn. R. App. P. 36(a) ( "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); see also Tenn. R. Evid. 103(a)(1) (requiring a timely objection as a prerequisite to a finding of error based on the trial court's admission of evidence).  Because Dodson has waived this issue, he is not entitled to relief unless the prosecutor's comments rose to the level of plain error.  See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."); Smith, 24 S.W.3d at 282-83; see also Gann, 251 S.W.3d at 458-59 (concluding that the defendant's failure to make a contemporaneous objection during closing argument waived plenary review of the issue

and precluded relief absent plain error). Additionally, we note that Dodson has made no plain error argument on appeal.

In order for this court to find plain error, "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'" Smith, 24 S.W.3d at 282 (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Id.

Dodson complains of a number of comments made by the prosecutor during closing argument. First, he contests the following comments made by the State during its rebuttal closing argument regarding the credibility of Lieutenant Sloan:

. . . [I]t is absolute garbage to suggest that Detective Sloan would put his reputation on the line, twenty-five years of police work . . . . He's not going to put himself on the line to get this guy and to get that guy.

The record reflects that Dodson extensively questioned Lieutenant Sloan's credibility during his closing argument. During closing argument, Dodson's counsel made the following statements: "Maybe you believe Lieutenant Sloan but when it starts to become a pattern, at what point is it not the truth anymore;" "[Lieutenant Sloan] lied about being present at the lineups;" and "[Lieutenant Sloan]'s done this twenty-five years. It's no big deal. I'm a lieutenant. Nobody's checking my work." Dodson's counsel also accused Lieutenant Sloan of altering the photographic lineups and deleting the alleged ATM video, stating, "Did it exist or did he delete that too?" Accordingly, the State's remarks were in direct response to Dodson's counsel's remarks about Lieutenant Sloan's credibility and were not improper.

Dodson next challenges the following comments made by the State during its rebuttal closing argument regarding the credibility of S.C.:

Credibility, it takes a lot of courage for a rape victim to go through what [S.C.] has gone . . . Then four and a half years later she has to take the witness stand and be subject again to cross-examination where she's accused of being an accomplice in her own rape. It takes courage. It's no wonder that women don't want to report rapes.

- 26 -

As we have previously noted, Dodson continually attacked S.C.'s credibility throughout trial as well and, in fact, based his defense theory on the idea that S.C. was an accomplice, not a victim. Therefore, S.C.'s credibility was fairly raised by the evidence and properly discussed by the prosecutor during closing argument. Likewise, the State's comment about women reporting rapes was made while discussing S.C.'s testimony that she was raped by the Defendants. Dodson claims that this comment "inject[ed] issues broader than the guilt or innocence of the accused." In our view, although this statement was not extremely pertinent to the issues in this case, it was made in response to Dodson's claim during his closing argument that he did not rape S.C. without addressing the fact that his DNA was found on her vaginal swab. Further, we decline to find that this one isolated statement requires plain error relief.

Next, Dodson argues that the prosecutor improperly commented on his right to remain silent by stating that, "I'm not even sure of what their version of it is." The State followed this by stating, "To be honest with you I guess [Dodson] just wasn't there despite the fact that [Dodson's] DNA was there, despite the fact that [Dodson's] palm print was on the car that they used to take [S.C.] to the ATM." Accordingly, we find that the statement was not a comment on Dodson's right to remain silent but rather an acknowledgment that the physical evidence presented at trial established that Dodson was one of the perpetrators even though Dodson alleged that he was not at 1795 Capri on the night of the offenses.

Finally, Dodson also claims that the State repeatedly called the defense's theory "'bogus'" and "'garbage'" to "improperly inflame the jury," and that the State made improper "appeals for sympathy." However, Dodson provides no analysis in support of these claims and, upon review, we find that these comments could not have affected the jury's verdict, particularly in light of the overwhelming evidence of Dodson's guilt. Accordingly, we decline to find plain error because a clear and unequivocal rule of law was not breached, a substantial right of the accused was not adversely affected, and consideration of the error is not necessary to do substantial justice. See Smith, 24 S.W.3d at 282. Dodson is not entitled to relief.

**VIII. Expert Witness Testimony.** Next, Dodson argues that the trial court improperly allowed MSRAC examiner Judy Pinson to testify outside her scope of expertise and without a proper foundation. Alternatively, Dodson argues that the trial court should have granted a continuance to obtain the original MSRAC examiner as a witness.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. Rule 702, which addresses the need for expert testimony and the qualifications of the expert, provides: "If scientific, technical, or other specialized

knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." The Tennessee Supreme Court defined the role of trial courts in determining the admissibility of expert testimony:

> Trial courts act as gatekeepers when it comes to the admissibility of expert testimony. Their role is to ensure that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. A court must assure itself that the expert's opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation. The court's reliability analysis has four general inter-related components: (1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability.

State v. Scott, 275 S.W.3d 395, 401-02 (Tenn. 2009) (internal citations and quotation marks omitted). The witness's necessary expertise may be acquired through formal education or life experiences. Neil P. Cohen et al., Tennessee Law of Evidence § 7.02[4] at 7-21. However, the witness must possess such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise exceeds the scope of common knowledge and experience possessed by the average person. Id. (citations omitted).

Tennessee Rule of Evidence 703 provides guidance regarding the proper bases for expert testimony:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

"Generally speaking, the trial court is afforded broad discretion in resolving questions concerning the admissibility of expert testimony; in consequence, we will not overturn its ruling on appeal absent a finding that it abused its discretion." State v. Ferrell, 277 S.W.3d 372, 378 (Tenn. 2009) (citing State v. Copeland, 226 S.W.3d 287, 301 (Tenn. 2007); State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993)). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." Scott, 275 S.W.3d at 404-05 (citing Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)).

Dodson first argues that Pinson's testimony was improper because she had no personal knowledge of S.C.'s examination and, accordingly, no foundation for her testimony. In support, Dodson cites to Tennessee Rule of Evidence 701, regarding lay witness testimony. However, Pinson was clearly admitted as an expert witness at trial, and, accordingly, Rule 701 does not apply. See Tenn. R. Evid. 701(a) (specifying that the rule only applies "[i]f a witness is not testifying as an expert."). Additionally, Dodson's claim that Tennessee Rule of Evidence 602 regarding witness personal knowledge invalidates Pinson's testimony is without merit, as "experts may base an opinion on the factual findings of others." Tenn. R. Evid. 602, Advisory Comm'n Cmnts.; see also Tenn. R. Evid. 703. During Pinson's testimony at trial, Dodson's counsel acknowledged that Pinson could properly testify about S.C.'s MSARC report and stated that "the defense agreed that Ms. Pinson can testify to what the records say . . . she can give opinion testimony now." Pinson was admitted as an expert without objection and the parties agreed to a redacted version of the MSARC report to exclude any potential hearsay. Dodson's contention is without merit.

Dodson next argues that Pinson's testimony exceeded the scope of her expertise. Pinson was admitted as an expert by the trial court in the area of "sexual forensic nurse examiner." Pinson was asked about the MSARC report's "extra genital level of acute injuries," and Pinson responded in part that S.C. "had a black eye." Dodson objected and argued that Pinson's testimony "should be limited to injuries in the area of genital [sic] the areas that are confined to purposes of sexual practice." The trial court overruled the objection, finding that, "I think in deciding whether or not someone gave consent or not, whether or not they had a black eye would be very relevant to a sexual assault so I don't see any problem with that at all." In her subsequent testimony, Pinson confirmed that S.C.'s black eye was consistent with her reported assault, which was being "hit with a gun." We agree with the trial court that Pinson's testimony related to S.C.'s sexual assault and was not an improper opinion. Further, this testimony was read directly from the MSARC report, which the parties agreed to admit as evidence after extensive redaction.

Finally, Dodson argues that the trial court erred by denying his request for a continuance to obtain testimony from the original MSARC nurse who treated S.C. On the first day of trial, the State informed the trial court that the MSARC nurse that treated S.C. no longer lived in Tennessee and would not be available to testify. Instead, the State intended to introduce Pinson as an expert witness and custodian of the records to testify about S.C.'s MSARC report. Sherrod's counsel objected, arguing that the examining nurse's testimony was crucial and requesting a continuance to produce her. The trial court questioned whether the examining nurse would be a material witness for the defense and noted that no affidavit of materiality had been filed. Dodson's counsel joined in Sherrod's objection, and, when asked whether he wanted a continuance, responded "we don't want a continuance to call the witness. We just want the proper witness called who made the observations." Neither Defendant offered argument as to why the original nurse's testimony would be material to their defense.

The decision whether to grant a continuance "rests within the sound discretion of the trial court." State v. Morgan, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991). The Tennessee Supreme Court has held that the reviewing court should "reverse the denial of a continuance only if the trial court abused its discretion and the defendant was prejudiced by the denial." State v. Thomas, 158 S.W.3d 361, 392 (Tenn. 2005). An abuse of discretion is shown when "the failure to grant a continuance denied [the] defendant a fair trial or [when] it could be reasonably concluded that a different result would have followed had the continuance been granted." Id. (quoting State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995)). In other words, this court will reverse a denial of a motion to continue only upon a showing that the petitioner "did not have a fair trial and that a different result would or might reasonably have been reached had there been a different disposition of the application for a continuance." Baxter v. State, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973); see also State v. Caughron, 855 S.W.2d 526, 534 (Tenn. 1993); State v. Butler, 795 S.W.2d 680, 684 (Tenn. Crim. App. 1990).

A defendant seeking a continuance on the basis of an absent witness must support the motion with an affidavit alleging the substance of the witness's testimony, the testimony's relevance and materiality to the defense, that the testimony was admissible and not cumulative, that the witness would be available at a later date, and that counsel exercised diligence in trying to obtain the witness's presence at trial. See State v. John Edward Lynch, No. M2010-02481-CCA-R3-CD, 2012 WL 3679575, at *7 (Tenn. Crim. App. Aug. 24, 2012) (citing State v. Dykes, 803 S.W.2d 250, 257 (Tenn. Crim. App. 1990), overruled on other grounds; State v. Bennett, 798 S.W.2d 783, 787-88 (Tenn. Crim. App. 1990); State v. Frahm, 737 S.W.2d 799, 802 (Tenn. Crim. App. 1987)). "This court has also recognized, however, that the lack of a written affidavit is not always controlling." John Edward Lynch, 2012 WL 3679575, at *7 (citing State v. Edward

Mitchell, No. W1999-01314-CCA-R3-CD, 2001 WL 204180 (Tenn. Crim. App. Mar. 1, 2001); State v. Alvin Glenn Hughes, No. 02C01-9208-CR-00183, 1993 WL 193712 (Tenn. Crim. App. June 9, 1993)).

Dodson has failed to show that the trial court abused its discretion in denying his request for a continuance in this case. The record reflects that Dodson never requested a continuance or filed an affidavit of materiality. Moreover, Dodson offered no proof as to what the witness's testimony would have been or how the testimony would have been material to his defense, much less how it would have changed the outcome of his trial. Further, on appeal, Dodson has not alleged how he was prejudiced by the trial court's denial of his request for a continuance or provided any information about the witness's materiality to the defense. He is not entitled to relief on this issue.

**IX. Void Indictment.** Finally, Dodson argues that count ten of the indictment charging possession of a firearm in the commission of a dangerous felony was insufficient for failure to give notice of the underlying dangerous felony. The State maintains that the indictment provided Dodson with sufficient notice.

Dodson's indictments included, among other charges, three counts of especially aggravated kidnapping, one count of aggravated burglary, and one count of employing a firearm during the commission of a "dangerous felony." Tennessee Code Annotated section 39-17-1324(a) states that "[i]t is an offense to possess a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony." Especially aggravated kidnapping and aggravated burglary are statutorily defined as "dangerous felon[ies]." See T.C.A. § 39-17-1324(i)(1). On the first day of trial, before opening statements, the trial court clarified that the "dangerous felony" in count ten had to refer to the aggravated burglary charge, because firearm possession was an element of the especially aggravated kidnapping charges. The State agreed and no objection was made by the defense. The trial court instructed the jury that "[t]he [t]enth [c]ount of this [i]ndictment charges the defendants with the offense of employing a firearm during the commission of an aggravated burglary."

Dodson contends that "the vague indictment is insufficient and fails to give notice of the charge by failing to enumerate a specific dangerous felony." However, the Tennessee Supreme Court recently held that an indictment charging employment of a firearm during the commission of a dangerous felony is sufficient to provide notice to the defendant without naming the predicate felony. State v. Duncan, 505 S.W.3d 480, 489-91 (Tenn. 2016). The Court held that "the predicate dangerous felony must be tried in the same trial as the firearm charge, so the defendant will not be surprised at having to make a defense against either of the two possible predicate felonies." Id. at 491. Like Duncan, Dodson was indicted for multiple counts of especially aggravated kidnapping and one

count of aggravated burglary. Although count ten, charging Dodson with employing a firearm during the commission of a dangerous felony, did not state the underlying felony, Dodson knew that the possible underlying felonies were to be tried in the same trial as the firearm charge, and was even informed before trial, to no objection, that count ten referred to the aggravated burglary charge. Therefore, as in <u>Duncan</u>, he was not surprised at having to make a defense against the possible underlying felonies. Accordingly, Dodson is not entitled to relief.

As a final matter, Dodson seemingly attempts to raise a sentencing issue in one sentence at the end of his brief. Dodson argues "that the trial court's consecutive sentence relating to counts one, two, and three all being ordered to be served consecutively to count ten be found to be an abuse of discretion pursuant to <u>State v. Bise</u>, 380 S.W.3d 682 (Tenn. 2012)." Dodson did not identify any sentencing issues in his statement of issues and, accordingly, "[a]n issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4)." <u>Mobley v. State</u>, 397 S.W.3d 70, 102 (Tenn. 2013) (citing <u>Hodge v. Craig</u>, 382 S.W.3d 325, 334 (Tenn. 2012)). Further, Dodson provides no citations to the record and no argument in support of this single statement. <u>See</u> Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waiver in this court."). We conclude that the issue is waived.

## <u>CONCLUSION</u>

Based on the foregoing, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE